UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| A.K.J., minor, next of kin, through her mother and guardian ad litem, Letayia K. D. Anderson, and ) | |
| Keyana Gaines, Administratrix of the Estate of Jermaine Jones, Jr., Plaintiffs' Decedent, ) | |
| Plaintiffs, ) | |
| v. ) | CIV. ACT. NO. _____ |
| Richard Roundtree, Sheriff Augusta-Richmond County, individually, as a policy maker and supervisor of all Augusta-Richmond County Sheriffs' Deputies, ) | COMPLAINT JURY TRIAL REQUESTED DAMAGES |
| Leslie Gaiter, acting under color of law, individually in his capacity as an Augusta-Richmond County Sheriff's Deputy, ) | |
| Richard Russell, acting under color of law, individually in his capacity as an Augusta-Richmond County Sheriff's Deputy, ) | |
| Christopher Brown, acting under color of law, individually in his capacity as an Augusta-Richmond County Sheriff's Deputy, ) | |
| John Tarpley, acting under color of law, individually in his capacity as an Augusta-Richmond County Sheriff's Deputy, ) | |
| All individually and jointly, ) | |
| Defendants. ) | |

**COMPLAINT**

COMES NOW, Plaintiffs, who show the Court the following.

1

**Jurisdiction and Venue**

1.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action asserts one or more deprivations of federal constitutional rights under color of law.

2.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims under Georgia law because the facts supporting the state claims arise from the same or similar facts supporting and form at least part of the same case or controversy under Article III.

3.  Venue is proper within the Augusta Division because the challenged incident occurred in Richmond County, and one or more of the defendants resides within Richmond County.

**Parties**

4.  Plaintiff Keyana Gaines is the mother and Administratrix of the Estate of Jermaine M. Jones, Jr., and she is competent to bring this action on behalf of the Estate for pre-death deprivations and injuries. Ms. Gaines was appointed by the Probate Court of Richmond County, Case No. 2023-RCGP-611, September 29, 2023, having been issued Letters of Administration for the same.

5.  Plaintiff A.K.J., is the minor daughter of Jermaine M. Jones, Jr., and the sole surviving next of kin, and therefore has standing under Georgia's wrongful death statute to bring a wrongful death claim, through her natural mother and guardian ad litem, Letayia K. D. Anderson.

6.  Defendant Richard Roundtree, Sheriff Augusta-Richmond County is sued individually, as a policy maker and supervisor of all Augusta-Richmond County Sheriff's Deputies, for conduct under color of law.

7.  Defendant Leslie Gaiter, is sued in his individual capacity for conduct under color of law as a Deputy with the Augusta-Richmond County Sheriff's Department.

8.  Defendant Richard Russell is sued in his individual capacity for conduct under color of

2

law as a Deputy with the Augusta-Richmond County Sheriff's Department.

9. Defendant Christopher Brown is sued in his individual capacity for conduct under color of law as a Deputy with the Augusta-Richmond County Sheriff's Department.

10. Defendant John Tarpley is sued in his individual capacity for conduct under color of law as a Deputy with the Augusta-Richmond County Sheriff's Department.

11. All Defendants are sued individually and jointly.

**Facts**

12. On October 11, 2021, at around 7pm Plaintiff[1] was riding in the backseat of a vehicle with his Father, Jermaine Jones Sr., and a relative, Mr. Baker, the owner and driver of the vehicle, as they were on their way to fix a tire on another car.

13. At around 7:14 pm they were at a towing yard near 2133 Vandivere in Augusta, and then drove past an apartment complex near that address, off Highland Avenue, in the vicinity of the Augusta Municipal Golf Course.

14. Plaintiff's car was then stopped by the flashing lights of Defendant Christopher Brown, who along with Defendant Richard Russell, had been near the apartment complex conducting an operation with a confidential informant trying to buy meth from the suspect of the operation.

15. The suspect of the operation got away, and Defendants Brown and Russell decided to stop Plaintiff's car because it was in area, and they had a hunch that it was possible that the suspect had gotten into Plaintiff's car, even though they admittedly did not see that happen.

16. Defendants Brown and Russell also wanted to stop Plaintiff's car to search for illegal drugs despite having no objective basis to suspect or believe that there were any illegal

---

[1]      "Plaintiff" from here onwards in the Complaint refers to Plaintiff's decedent, Jermaine Jones, Jr.  Also, reference to "Plaintiff's vehicle" is reference to the vehicle in which Plaintiff was passenger where the vehicle is owned by the driver Mr. Baker.

drugs, and because, upon information and belief, they suspected and hoped that the occupants of Plaintiff's car were African American.

17. Defendants Brown and Russell falsely claimed that they had justification to stop Plaintiff because the license plate on Plaintiff's car was obscured.

18. Defendants Brown, Russell, Tarpley conducted the traffic stop and were involved in getting the driver's license and then going back to get his insurance information.

19. Away from the car officers Brown, Russell, Tarpley talked about when the police K-9 would arrive, to prolong the stop until the K-9 arrived, by falsely claiming that there was a computer malfunction preventing the processing of the driver's insurance information.

20. The driver, Mr. Baker, was asked for consent to search the vehicle and he granted them consent.

21. Jones Sr. was ordered out of the vehicle and patted down for weapons, and then without cuffing him or otherwise restraining him, directed him to sit down behind the vehicle on the curb near where Defendant Russell who was behind the curb watching.

22. Plaintiff was ordered out of the vehicle and patted down for weapons, and then without cuffing him or otherwise restraining him, directed him to sit down behind the vehicle on the curb near where Defendant Russell who was behind the curb watching.

23. On the other side of the vehicle Mr. Baker was similarly patted down for weapons and walked without handcuffs to the back of the vehicle and initially rested against the back of the vehicle until Russell directed him to sit down.

24. Officer Gaiter was near Officer Russell behind the car and was able to see and observe each of the passengers being patted down and then left to walk without handcuffs to sit down on the curb directly in front of Russell, under his control.

25. Officer Russell was close enough to Plaintiff that if tried to stand up, Russell could have put his hands on his shoulder and pushed him down before he even stood up.

26. Officer Russell noticed that Plaintiff was gathering his feet up under his torso in preparation of standing up, but Russell who had suspected Plaintiff of being in a flight mode because of shallow breathing he had earlier observed, realized that Plaintiff was getting ready to stand up and flee, but Russell made no effort to hold Plaintiff down or to give him a warning that he would be tased if he began to run.

27. Officer Gaiter, who was near Russell, heard Plaintiff tell his father he was going to run.

28. After Plaintiff stood up, Plaintiff took one slow step, and Officer Gaiter apparently saw him standing up and deduced he was getting ready to run.

29. Officer Gaiter started to run at Plaintiff and as Plaintiff was taking his second or third step, tackled Plaintiff near the head and shoulders, slamming Plaintiff down with his weight on top of Plaintiff, and Plaintiff's head hitting the pavement.

30. At or near the same time that Gaiter had started to move to attempt to tackle Plaintiff, Defendant Russell deployed his taser and then engaged it in Plaintiff's back causing Plaintiff to lose control and Gaiter's tackle drove Plaintiff to the ground in combination with the taser deployment by Russell.

31. Defendant Gaiter was on top of Plaintiff, and Plaintiff's head was on or near the ground, and Gaiter hit Plaintiff in the head at least three times with his fist, or heel of his hand, when Plaintiff's head was pinned against or near the pavement which prevented the head from dissipating some of the force through deflection of his neck as if he had been standing.

32. Upon information and belief, shortly before the blows an officer searching the car, yelled 'there's a gun under his seat, that's why he ran.'

33. Russell subsequently apologized to Defendant Gaiter for deploying the taser when Gaiter had expected to detain Plaintiff by the tackle, with Russell risking harm to Gaiter.

34. Defendant Russell, who was trained as an EMT, and had seen Plaintiff hit the pavement with Gaiter on top of him, and Gaiter, as detailed below, failed to timely get Plaintiff to the hospital, creating a 28-40 minute delay, by leaving him at the scene for about seven minutes, from 7:36 pm to 7:43 pm, and then taking him to the jail before finally getting Plaintiff to the hospital at 8:31pm.

35. When Defendant Gaiter was driving Plaintiff to the Jail, Plaintiff started moaning and said he needed to go to the hospital, and when Defendant Gaiter observed Plaintiff outside the Jail, Plaintiff was nonresponsive, which is when Gaiter finally took Plaintiff to the hospital.

36. When Plaintiff finally arrived at the hospital, a CT scan of his head was done and Mr. Jones was rushed into emergency brain surgery.

37. He had two emergency brain surgeries within 12 hours.

38. Mr. Jones never regained consciousness and was taken off life support and died on October 18, 2021.

39. Mr. Jones's severe traumatic brain injuries are from much more than a single fall to the ground following being tased. The medical records show that Mr. Jones had multiple brain hemorrhages, brain swelling, as well as skin lacerations and muscle contusions at three separate locations of his head – one on the left front of the head, one on the right front of the head, and one on the back of the head.

40. The hemorrhages included a large right subdural hematoma, diffuse subarachnoid hemorrhage, and multiple additional hemorrhages within the brain tissue in various areas of the brain.

41. The pattern of injuries noted on the CT imaging of Mr. Jones's head are not consistent with a single fall to the ground, nor can they be explained by the tasing.

42. A single ground-level fall would be expected to result in a single area of swelling to the head, in the place where it sustained contact with the pavement.

43. But CT imaging of Mr. Jones's head demonstrates multiple injuries across the left and right sides of the head, as well as both the front and the back of the head, suggesting multiple blows at different locations.

44. Statements made by Dr. Payne, who treated Mr. Jones in the emergency room at AUMC, explained that it is extremely unlikely that Mr. Jones's fatal brain injuries were caused just by falling down after being tased, as they are much more severe than what would be caused by a single fall.

45. The GBI and the District Attorney investigated the death of Plaintiff, but ultimately declined to press charges against Defendants, because the District Attorney found that the medical evidence did not show beyond a reasonable doubt which force used on Plaintiff, the tasing by Russell, or tackling by Gaiter, or the blows to the head by Gaiter, caused the death of Plaintiff, but in this civil action, Plaintiff need not identify a single, sole cause of the death, nor prove a link between a specific blow and death beyond a reasonable doubt, because the tasing, tackling, and blows to the head each proximately caused and substantially contributed to the injuries and death, which are recognized as an indivisible injury.

46. Dr. Terry's forensic pathology report on which the District Attorney relied, concluded that homicide was the cause of Jermaine Jones Jr.'s death.

**COUNT 1: Unlawful traffic stop**
**in violation of the Fourth Amendment**
**Against Defendants Christopher Brown and Richard Russell**

47. Defendants Christopher Brown and Richard Russell are liable under 42 U.S.C. § 1983 for violating the Fourth Amendment on October 11, 2021, when Defendant Brown intentionally seized, i.e. stopped and pulled over the vehicle in which Plaintiff was riding, without any objective basis to believe that there had been a traffic violation or any other violation of the criminal law.

48. Defendant Brown initiated the stop of Plaintiff's vehicle because Defendants Brown and Russell allege, they had been conducting an observation and possible arrest operation at an apartment complex with a group of people milling around, with their confidential informant trying to enter into a meth sale, and the suspect or target of the operation was not found.

49. Defendant Brown and Russell allege that Brown saw the vehicle in which Plaintiff was a passenger, driving nearby and speculated, for no specific or objective reason, that maybe the target of the operation was in that vehicle.

50. Defendant Brown admitted that he had not seen the suspect get into the vehicle in which Plaintiff was riding, but nonetheless pulled over the vehicle, on a pretextual hunch that the stop could lead to evidence of illegal drugs or related criminal activity.

51. Upon information and belief, Defendant Brown's pretextual and objectively unreasonable hope of finding drugs in the vehicle was the only basis for the stop, and indeed the officers searched for drugs after pulling the car over.

52. Defendants' pretextual motive is further shown by  Brown and Russell along with the other deputies stalling the Plaintiff's stop in order for a police K-9 to arrive to search for drugs.

53. Contrary to Defendant Brown's false statements that the stop was justified by an obscured license plate, Defendant Brown intentionally fabricated the basis for the stop, falsely alleging the vehicle's license plate and numbers were obscured, when in fact the license plate and numbers were clearly visible.

54. Defendant Brown is liable for personally stopping Plaintiff's vehicle.

55. Defendant Russell is liable for participating in the decision to stop Plaintiff's vehicle when he explicitly or implicitly directed or approved of Defendant Brown stopping Plaintiff's vehicle for a bogus reason.

56. Defendant Brown was at the apartment complex working on the operation with Defendant Russell, and they communicated via radio about seeing Plaintiff's vehicle

driving past the area, and that it was possible the suspect was in the vehicle, even though Brown told Russell that he had not seen the suspect get into Plaintiff's vehicle, and they then said Brown would follow the car to see if they could find a basis to stop it, and use the stop as a basis for an investigative search of the vehicle and its occupants.

57. Upon information and belief Brown and Russell talked about asserting that the license tag was obscured to have a basis for the stop, even though Defendant Russell had not seen an obscured license plate on the car in which Plaintiff was riding.

58. Defendant Brown turned on his blue traffic lights which caused the driver, Mr. Baker, to pull over, and then Brown informed Russell about stopping the vehicle.

59. Brown went to the passenger's side of the vehicle and told the driver, and passengers Jermaine Jones, Sr, and the Plaintiff's Decedent, Jermain Jones, Jr. that he had stopped the car because the tag was covered by a tinted cover, which he said was illegal in Georgia.

60. The unlawful traffic stop proximately caused Plaintiff to suffer the use of force by the officers, including the tasing, tackling, and injuries to his head that caused Jermaine Jones, Jr.'s pre-death injuries, and pain and suffering, and foreseeably his death, and the injuries, suffering and damages as more specifically articulated in paragraphs 36-44 and 159-60.

### COUNT 2: Unreasonably prolonged traffic stop
### in violation of the 4th Amendment
### against Defendants Christopher Brown, Richard Russell, and John Tarpley

61. Defendants Christopher Brown, Richard Russell, and John Tarpley are each liable individually and jointly under 42 U.S.C. § 1983 for violating the Fourth Amendment on October 11, 2021, when the traffic stop of Plaintiff was unreasonably prolonged.

62. The traffic stop began at about 7:14 pm and, at least by about 7:34 pm, before Plaintiff tried to leave and was tased, tackled, and beaten; the stop had been unreasonably

prolonged in violation of the Fourth Amendment, so the officers no longer had any lawful authority to seize Plaintiff, nor prevent him from leaving the scene.

63. Defendants Russel and Brown, on the passenger side of the vehicle, twice asked whether they had any illegal drugs in the car, which is not reasonably related to traffic law enforcement.

64. From about 7:19 pm, when the driver's insurance card was taken to check in the police computer system, through at least 7:31pm, the officers asserted that there was a delay in processing the insurance information, claiming the computer was not working, when they were stalling to give a drug K-9 and its handler time to arrive.

65. But, upon information and belief, discovery will show an 'events system log' or other historical data for the computer or the electronic record keeping system for drivers' licenses and insurance, that was allegedly malfunctioning and that the officers lied about a computer issue in order to extend the stop to search for evidence of drugs or some other crime unrelated to any alleged traffic violations justifying the stop, as inferred from the following circumstances:

66. The computer was working minutes earlier when the officers processed the driver's license information.

67. Upon information and belief, during the material time there was at least one other police vehicle at the scene, and if the first police vehicle's computer was malfunctioning they would have, and reasonably should have, used the second vehicle's computer.

68. The alleged delay due to the computer malfunction lasted until a police drug dog arrived at the scene, which is suspicious timing indicating the alleged delay was fabricated by the police in their pursuit of evidence of criminal activity unrelated to traffic enforcement.

69. The officers' other statements, including lying about different aspects of the stop, show that their assertion about a computer issue is likely also a lie, including the following three paragraphs:

70. The officers lied about the reason for the stop, claiming there was an obscured license plate, and claiming that it was just a routine traffic stop as opposed to a search for illegal drugs or criminal activity.

71. Defendant Gaiter or one of the officers lied to a doctor at the hospital, saying that Plaintiff had been tased after reaching for a gun.

72. Defendant Gaiter lied about believing that Plaintiff had a gun.

73. Defendants' fabrication of a computer issue allegedly delaying the insurance processing for over 12 minutes, obviously added significant time to the stop and upon information and belief, the insurance processing could reasonably have been done in five minutes, so Defendants' delay added at least seven minutes to the stop.

74. The officers also intentionally created an unreasonable delay by asking at the beginning of the traffic stop, around 7:14pm, for the driver's license, and then spending approximately four minutes processing the license information in his patrol vehicle computer, before then returning to the car in which Plaintiff was riding to ask for the driver's insurance information.

75. Officers Russell and Brown unreasonably put off receiving the insurance information until after processing the license information in order to delay the stop until the K-9 arrives, as shown by Defendant Tarpley's statement to another officer at about 7:25 pm that they were waiting on the police K-9 to arrive.

76. By putting off receiving the insurance information the officers added time to the stop, because it required making an extra trip walking back and forth between the two cars, which likely required an extra 30 seconds or a minute; moreover, upon information and belief, it is reasonable and quicker to process the license and insurance information in the computer at the same occasion at the computer.

77. Defendants Christopher Brown, Richard Russell, and John Tarpley are each liable for individually participating at the scene of the traffic stop, including unreasonably prolonging the stop by delaying the processing of the insurance, and upon information and belief they each asserted or went along with the ruse that the computer was malfunctioning, and they each could have intervened to prevent the stop from exceeding their lawful authority to seize Plaintiff.

78. Defendant Russell also personally participated in prolonging the traffic stop by approaching the passenger's side of Plaintiff's vehicle, talking about cars, with the driver and passengers, controlling and extending the traffic stop.

79. Defendant Tarpley also personally participated in the challenged stop by approaching the driver's side of Plaintiff's vehicle and getting Mr. Baker's driver's information, and at about 7:20pm he radioed another officer asking about when the police drug dog would arrive.

80. At about 7:25pm Defendant Tarpley stated to another officer that they were waiting on the drug dog to arrive.

81. The unlawful traffic stop proximately caused Plaintiff to suffer the use of force by the officers, including the tasing, tackling, and injuries to his head that caused Jermaine Jones, Jr.'s pre-death injuries, and pain and suffering, and foreseeably his death, and the injuries, suffering and damages as more specifically articulated in paragraphs 36-44 and 159-60.

### COUNT 3: Racially discriminatory traffic stop
### in violation of the Equal Protection Clause
### against Defendants Christopher Brown and Richard Russell

82. Defendants Christopher Brown and Richard Russell are each liable individually and jointly under 42 U.S.C. § 1983 for violating the Fourteenth Amendment's Equal Protection Clause on October 11, 2021, when they stopped the car in which Plaintiff

was riding and then unnecessarily prolonged the stop, because of the race of the occupants, African American.

83. Plaintiff, Plaintiff's father, Jermaine Jones, Sr., and the driver of the car, Mr. Baker, are African American.

84. Upon information and belief, the suspect that Christopher Brown alleges he sought was African American, based in part on the fact that the residents of the apartment complex were largely African American.

85. Christopher Brown alleges that he had seen the Tahoe, Suburban or car in which Plaintiff was riding near or in the complex, and in association with a group of African Americans, who were outside at the apartment complex.

86. Christopher Brown alleges that the suspect, who is alleged to be African American might have entered the vehicle in which the Plaintiff was riding, and that he and Russell were looking for a basis to stop the vehicle to check if the suspect were with other African Americans who were presumed to be in the car.

87. Upon information and belief, before stopping the car in which Plaintiff was riding, Defendants Brown and Russell suspected that Plaintiff and the other occupants of the car were African American, and that Defendants would then confirm their race when Brown first made contact and asked them to roll down the window.

88. Upon information and belief, African Americans were targeted for traffic stops by Defendants Brown and Russell at a higher rate, and detained longer than White Americans, and the adverse treatment was substantially because of race.

89. The racially discriminatory traffic stop proximately caused Plaintiff to suffer the use of force by the officers, including the tasing, tackling, and injuries to his head that caused Jermaine Jones, Jr.'s pre-death injuries, and pain and suffering, and foreseeably his death, and the injuries, suffering and damages as more specifically articulated in paragraphs 36-44 and 159-60.

**COUNT 4: Per se excessive force**
**in violation of the Fourth Amendment**
**against Defendants Russell and Gaiter**

90. Defendants Richard Russell and Leslie Gaiter are liable under 42 U.S.C. § 1983 for violating the Fourth Amendment on October 11, 2021, when Russell tased Plaintiff engaged in passive flight, and Gaiter tackled Plaintiff's head area in a dangerous manner when Plaintiff was passively trying to leave, and then Gaiter beat Plaintiff about the head, when these Defendants had no authority to use force on Plaintiff at all.

91. When Plaintiff stood up and started leaving the scene of the traffic stop and Defendants Russell tased and Gaiter tackled and beat Plaintiff, these Defendants had no lawful authority to seize or use any force on Plaintiff.

92. For the same reasons detailed in Counts 1 and 2, Defendants Russell and Gaiter had no Fourth Amendment authority to initiate the traffic stop or to prolong it as long as they did, so, by the time Plaintiff got up to leave at about 7:34 pm, he was not lawfully seized by Defendants, i.e. he was free to leave, and resist an unlawful detention.

93. Nor was there any objective basis or probable cause to arrest Plaintiff for a crime as of the approximately 7:34 pm tasing by Russell and tackling and beating by Gaiter: the officers had not yet learned of the gun or any other contraband or incriminating evidence in the car, even if after the tasing, tackling and beating of Plaintiff's head by Gaiter, and officer near the car subsequently shouted "gun," and "gun in the car" and "that's why he ran."

94. Upon information and belief, discovery, including the deposition of the police K-9 handler, records of prior alerts by this K-9, and other circumstances showing that any alert by this police K-9 during the challenged traffic stop was not an objectively reliable or reasonable basis to support reasonable suspicion that specifically Plaintiff, versus the other two passengers, had drugs, nor that illegal drugs were in the vehicle cabin, not reasonably attributable to just Plaintiff.

95. The tasing, tackling, and beating of Plaintiff was a proximate cause of his pre-death injuries, pain and suffering, and his death, and the injuries, suffering and damages as more specifically articulated in paragraphs 36-44 and 159-60.

**COUNT 5: Excessive force for tasing Plaintiff
in violation of the Fourth Amendment
against Defendant Richard Russell**

96. Defendant Richard Russell is liable under 42 U.S.C. § 1983 for violating the Fourth Amendment on October 11, 2021, when he used excessive force on Plaintiff by failing to use physical restraint before Plaintiff could stand up, seeing and knowing Plaintiff was standing up to leave, and then, without warning, tasing Plaintiff in the back, where there was no evidence Plaintiff was a threat to others or was engaged in anything more than passive flight, and the tasing foreseeably caused Plaintiff to lose control of his body and hit his head on the pavement, with or without the weight and force of Gaiter who tackled and landed on Plaintiff, causing serious injury to Plaintiff's brain, leading to death, about a week later.

97. After Plaintiff, driver Mr. Baker and Plaintiff's father were out of the vehicle, and were  patted down for weapons, one or more of the officers including Russell ordered them to sit behind the vehicle on the curb.

98. All three sat on the curb and Russell stood right behind them, where he could observe their movement to determine if they made preparations to stand up, and easily use his hands to touch or push down on the suspect's shoulders during movement in preparation of standing up, to keep that person seated.

99. In an interview for the criminal investigation, Russel indicated that even before Plaintiff exited the vehicle that he believed Plaintiff was in a flight mode based on Russell's observation of the nature of Plaintiff's alleged shallow breathing, that Russell alleged he had observed.

100.     After Plaintiff had been sitting on the curb while officers other than Rusell, including officer Brown, were beginning the search of the vehicle, Russell observed Plaintiff start to gather his feet closer to his torso, which Rusell knew and appreciated as preparation for standing up and leaving.

101.     Although Rusell was standing close enough to Plaintiff to use his hands to push down on Plaintiff's shoulders and tell him to stay seated, Russell wantonly refused to take a less lethal means to keep Plaintiff from leaving.

102.     Russell admitted in the interview in the criminal case that he believed the taser was invented so that officers did not have to get hurt doing their work, and therefore the taser could be used to prevent flight, forsaking other physical intervention, or using his hands to control Plaintiff before he could stand up, which in this case would have caused no injury.

103.     Defendant Russell, without giving any warning that a taser might be used if Plaintiff continued to attempt to take movements in preparation of standing up, Russell let Plaintiff stand up and take a step, and then one or two more steps, and then Russell intentionally tased Plaintiff in the back.

104.     When Russell tased Plaintiff in the back it was obviously foreseeable that the tasing would cause Plaintiff to lose control of his muscular functioning, and fall to the ground and likely injure his face and head, and foreseeably his brain, and diminish its critical functioning.

105.     The Taser company and training in other departments shows that it is dangerous to tase someone in flight or attempting to run away, because of the foreseeable fall and hitting one's head, and therefore tasing someone in the back who is standing or running can cause serious and grave injury to the face, head and brain, from the fall, and therefore it was only appropriate to tase someone engaged in flight who was also an imminent risk of serious injury to others, or who had just seriously injured another in the commission of a serious criminal act.

16

106.     There was no legitimate need to tase Plaintiff to prevent his escape, because Rusell could have easily used physical restraint before Plaintiff stood up.

107.     Because Russell gave no warning, which Gaiter, who was nearby, saw and heard what Russell saw and heard, that Plaintiff was engaged in mere passive flight, and therefore it was inappropriate to shoot the taser into Plaintiff's back, where Defendant Gaiter was already moving to tackle Plaintiff and secure him, when Russell was deploying the taser.

108.     Russell's action of shooting Plaintiff in the back without warning of the prospective use of the taser, a warning which Gaiter would have heard, endangered Gaiter because Gaiter knew that he should try to stop Plaintiff, and the circumstances were such that the taser should not have been used, so Gaiter was tackling Plaintiff at about the same time that Russell deployed the taser.

109.     Gaiter could have been shot by the taser, or otherwise shocked by the taser Russell had deployed and engaged when Gaiter was tackling Plaintiff.

110.     Officer Russell apologized at the scene for causing Gaiter to be close to being tased by the taser Russell needlessly deployed at Plaintiff.

111.     The taser rendered Plaintiff helpless and less able to protect himself from the full weight of Gaiter who had tackled him to the pavement causing Plaintiff's head to hit the pavement harder than it would had Plaintiff been in control of his body and been able to brace and lessen the impact of hitting the pavement with Gaiter on his upper body.

112.     There was no legitimate need to tase Plaintiff to prevent his escape, because the officers already had sufficient information to identify Plaintiff, either from Plaintiff, or from his father, so they could have found Plaintiff later.

113.     Hours after the tasing, when Plaintiff was at the hospital Defendant Gaiter called Officer Russell asked if they needed to "sit on," i.e. guard, Plaintiff, while he was at the hospital, and Defendant Russell indicated that there was no need, because

17

they would be able to find him later and he was not charged with dangerous crimes, which shows there was no legitimate reason for the taser in the first place.

114.    When Russell tased Plaintiff, Russell had no objective reason to think that Plaintiff was dangerous or a threat to anyone, as shown in the following three paragraphs:

115.    Russell knew that Plaintiff was unarmed because Russell was standing a couple of feet away and observed the weapons pat down of Plaintiff that had just been conducted as Plaintiff was leaving the car before he walked over and without being cuffed, sat down on the curb in front of Russell.

116.    Russell saw that Plaintiff was running away from the vehicle and the officers at the scene, so his flight posed no danger to anyone at the scene.

117.    Russell could not have seen or noticed anything from Plaintiff's demeanor or conduct during the stop that indicated that he was violent or dangerous to anyone, because no such conduct occurred.

118.    When Russell tased Plaintiff, Russell had no objective reason to believe that Plaintiff was engaging or had engaged in any criminal activity, much less a serious crime or a crime of violence.

119.    Defendant Russell's tasing of Plaintiff in the back as he attempted to start to run away,  as an obviously foreseeable result, caused, Plaintiff to fall and hit his head on the pavement, which would likely cause a serious head injury that would foreseeable be a fatal injury (either on its own or as part of a multiply-caused indivisible injury, also caused by the tackle and blows to the head).

120.    Any reasonable officer would have known that there was a substantial risk of serious injury or death from tasing someone in the back as they run away.

121.    Any reasonable officer would have known that there was no legitimate state interest in capturing Plaintiff or prolonging his seizure at the traffic stop: no harm would have come from letting him leave.

122.     The tasing of Plaintiff was a proximate cause of his pre-death injuries, pain and suffering, and his death, and the injuries, suffering and damages as more specifically articulated in paragraphs 36-44 and 159-60.

**COUNT 6: Defendant Gaiter tackling Plaintiff to the pavement in a manner that targeted his head, and blows to the head, killing Plaintiff, in violation of the Fourth Amendment**

123.     Defendant Leslie Gaiter is liable under 42 U.S.C. § 1983 for violating the Fourth Amendment on October 11, 2021, when he used excessive force on Plaintiff and foreseeably caused his death.

124.     On officer's command, Plaintiff, exited the vehicle, and was subjected to an announced and ordered weapon pat down which showed Plaintiff had no weapons in the front or pockets of his pants.

125.     Gaiter and Russell were nearby, and in their own safety and self-interest, and the safety of others, should have been and were observing that Plaintiff was patted down for weapons and contraband, which Gaiter and Russell observed, and Gaiter and Russell knew, concluded and acted as if Plaintiff did not have a weapon in the front or pockets of his pants.

126.     After watching the weapon pat down of Plaintiff near the passenger-side back seat door, Gaiter and Russell saw or knew that Plaintiff was directed by the officer doing the pat-down to walk to the rear of the car and to Russell's control, and Plaintiff was allowed to walk to the rear of the vehicle without escort and with Plaintiff's hands free or not cuffed, which was an objective sign that the officers believed Plaintiff did not have a weapon.

127.     Gaiter saw or knew that Russell had ordered Plaintiff and the two others to sit on the curb, that Plaintiff, and the others were seated on the curb with their backs to Russell, close to and in front of Russell, with their hands free or not cuffed, while a

search of the vehicle was being conduct, which was an objective sign that Plaintiff did not have a weapon.

128.     Gaiter believed that Plaintiff did not have a gun while Plaintiff was sitting with his hands free close to Russell because Gaiter did not take action to conduct his own pat down nor restrain the hands of Plaintiff and the others.

129.     Gaiter saw and knew that Russell was standing so close, and behind the Plaintiff and the others, that if any of them were to start to stand up, that Russell could reach out with his hands and place one or two hands on that person's shoulders and keep that person from standing up, and Gaiter was close enough to intervene.

130.     Gaiter was standing nearby and observing Rusell, the Plaintiff and the others, and Gaiter was there for backup in case anything happened.

131.     As the Plaintiff was sitting on the curb and the search was being conducted, Gaiter overheard Plaintiff tell his father he was going to run, so Gaiter watched Plaintiff, as Russell was watching Plaintiff, and Russell saw Plaintiff gathering his feet closer to his torso, in preparation of standing up, and concluded he would stand up and flee.

132.     Gaiter watched Russell watch Plaintiff stand up and not take any objectively reasonable action to make Plaintiff sit back down.

133.     Gaiter saw Plaintiff stand up and take one step as if walking, without Russell's involvement or verbal warning, and upon information and belief Plaintiff saw Gaiter moving toward him and he started to run, without threatening anyone.

134.     By the time Plaintiff had taken two or three steps, Defendant Gaiter, was rapidly moving toward Plaintiff from Plaintiff's left, nearly perpendicularly to Plaintiff's direction, and Gaiter did a flying tackle at, and hit Plaintiff's upper body and head, driving Plaintiff's upper body and head to the pavement, with Gaiter's body landing on top of Plaintiff's upper body and head.

135.     Plaintiff was about five feet nine inches tall and weighed about one hundred fifty pounds, and Gaiter was about six feet two and weighed about two hundred twenty pounds, plus.

136.     When tackling Plaintiff to the ground with his heavy body, Defendant Gaiter targeted Plaintiff's upper body and head, to cause Plaintiff's head to crash into the asphalt under Gaiter's weight, to send a message of pain for attempting to flee detention.

137.     After Gaiter had tackled Plaintiff to the pavement, and had Plaintiff and his head  pinned to the ground, Defendant Gaiter pushed his knee into Plaintiff's back so hard that Plaintiff had difficulty breathing, showing he had control of Plaintiff even though Plaintiff posed no threat to Gaiter or others.

138.     The head is a non-target area, unless the officer(s) is, or others are, in imminent danger of serious or deadly harm, where, upon and information and belief, Gaiter was so trained, and stated department policy does require, Gaiter knew of the training and policy but nonetheless intentionally struck Plaintiff in the head with such great force it would cause serious head injury.

139.     Instead of Gaiter using his hands to grab Plaintiff's arms to cuff Plaintiff, Gaiter struck Plaintiff's head with at least the heel and hard part of his hand, or with a fist, at least once, if not two or more times causing serious or traumatic brain injury.

140.     When Gaiter was hitting Plaintiff's head, it was against or near the pavement, and when struck was pinned against the pavement, which meant that full weight and effect of the blow had to be absorbed by the head and skull's plates, sutures and fissures,  which meant there was no "give" to the force or blow, by a flexible neck, as in the instance when a person who is standing up is struck in the face or head.

141.     The law is clear, that a blow to the head is lethal force, and that the head is a non-target area, whether the person is standing up or not, and when the head is pinned against the pavement, and unless circumstances exist in which deadly force is justified,

it was clear to Gaiter, and any reasonable officer in Gaiter's position, that the circumstances did not show that Plaintiff had then committed a serious or dangerous felony, nor that he presented a threat of imminent serious harm to anyone by the manner and circumstances of his flight, such that lethal or severe force could have been applied to Plaintiff's head, in response to the mere passive flight.

142.     When Defendant Gaiter, tackled Plaintiff to the ground, and was on top of him, Plaintiff had the inviolate and involuntary right of self-defense to protect himself from excessive force, and Plaintiff posed no threat of harming anyone: his hands were pinned beneath him, Gaiter was securely pinning him to the ground, and Gaiter was soon joined in controlling Plaintiff by two or three additional officers, while Plaintiff at most, was passively resisting the officers, but not offensively assaulting the officers, as Plaintiff was on his stomach, with Gaiter on his back, and other officers holding other parts of Plaintiff's body including the hands.

143.     The medical records of Plaintiff's injuries and death will allow a Doctor to competently testify that the tasing and crash to the ground with Gaiter on top of Plaintiff, landing at least partially on Plaintiff's head, was not the only cause of Plaintiff's death, and that the force from one or more of Gaiter's blows to Plaintiff's head, from the heel of the hands, fists or just the hand, with the head pinned against the pavement, significantly contributed to Plaintiff's traumatic brain injury, leading to brain death and death.

144.     The medical evidence therefore supports an inference that Gaiter used lethal, grave or serious and severe force when striking Plaintiff's head, which is further corroborated by the extreme size and strength of Leslie Gaiter, over 220 pounds, the position he was in right above and striking down on Plaintiff whose head was against the pavement.

145.     Defendant Gaiter knew and should have known that the hits to Plaintiff's head would seriously and could permanently and severely injure Plaintiff, and potentially cause paralysis or death.

146.     Defendant Gaiter's tackling that targeted Plaintiff's head and his blows to Plaintiff's head was a proximate cause of Plaintiff's pre-death injuries, pain and suffering, and his death, and the injuries, suffering and damages as more specifically articulated in paragraphs 36-44 and 159-60.

**COUNT 7: Failure to provide medical care in violation of the Fourth Amendment or the Fourteenth Amendment's Substantive Due Process Clause against Defendants Leslie Gaiter and Richard Russell**

147.     Defendants Leslie Gaiter and Richard Russell are liable under 42 U.S.C. § 1983 for violating the Fourth Amendment or the Fourteenth Amendment's Substantive Due Process Clause on October 11, 2021, when they each failed to provide timely medical care to Plaintiff that could have saved his life. Plaintiff brings this claim in the alternative that there was time to save his life despite the severity of his brain injury from the assault.

148.     As of about 7:36 pm on October 11, 2021, Plaintiff was handcuffed on the ground, and the scene was secure, such that there would be no legitimate reason to delay providing or seeking emergency medical care for Plaintiff.

149.     As a result of the tasing and beating to the head, Defendant Richard Russell, who was a nationally certified EMT, should and must have known from his EMT training that serious blows to the head, could, even though there might not be visible bleeding or injury nor immediate altered mental status or unclear thought demonstrated by unusual speech and logic, likely lead to a life-threatening brain injury, that required immediate careful examination by a trained physician, neurologist or neurosurgeon, with access to medical examination equipment found at hospitals, with care of constant monitoring for signs of altered mental status, disorientation or vomiting.

150.     In Defendant Russell's EMT  training he likely learned that blows to the head can cause serious concussions or serious brain injuries, even when there is no external bleeding or other exterior signs of injury, and require monitoring for sickness or other symptoms that arise after the injury.

151.     Defendants Gaiter and Russell each must have known that serious blows to someone's head could trigger a concussion or other serious brain injury, including because, upon information and belief they were each trained not to target someone's head with a closed hand fist because it poses a substantial risk of serious brain injury.

152.     Upon information and belief, Defendant Gaiter and Russell each knew from common knowledge, including from the community-wide, national and popular recognition that concussions in football from blows to the head cause serious injuries, even when there is no bleeding or other exterior signs of injury, and require professional monitoring for sickness or other symptoms that arise after the injury's initial creation.

153.     Upon information and belief, Defendants Gaiter and Russell had received formal training from the Sheriff's Department that persons who have sustained a blow to the head, whether at the hands of an officer, right or wrong, or auto accident, that blows to the head create a risk of substantial harm or death, creating the need for immediate medical intervention in a hospital setting.

154.     Defendants Gaiter and Russell each knew and must have known of the obviously serious injury to Plaintiff, because they each knew of the tasing and Plaintiff being slammed to the ground, and, at least as to Gaiter, knew of the beating to Plaintiff's head.

155.     Defendant Russell intentionally or recklessly disregarded his actual notice of Plaintiff's emergency medical condition: instead of ordering that Plaintiff be taken to the hospital, Defendant Russell allowed Plaintiff to stay at the scene of the traffic stop for approximately seven minutes until about 7:43 pm, without treatment or effort to

obtain treatment for Plaintiff, and at about 7:43 pm Defendant Russell instructed Defendant Gaiter to transport Plaintiff to the jail instead of the hospital.

156.     Although the hospital was less than fifteen minutes away from the scene, such that Plaintiff should reasonably have been taken there by about 7:51, he did not arrive until 8:31pm or later, a 40-minute delay for no legitimate reason.

157.     Upon information and belief, Officer Gaiter only informed the hospital that Jones , Jr. was tased and fell to the pavement, but did not inform the physicians and nurses at the hospital of the blows Gaiter delivered to Plaintiff's head by the tackle, strikes and contact with the pavement, when he first arrived at the hospital with Plaintiff, causing unnecessary delay or time needed for immediate medical intervention, leading to a suspicion that the altered mental status was alcohol or drug related, when it was not.

158.     Despite Defendant Gaiter's actual knowledge of Plaintiff's emergency medical condition he intentionally or recklessly disregarded Plaintiff's medical needs by failing to take Plaintiff immediately to the hospital from the scene or once Plaintiff was in the car and began exhibiting symptoms of a concussion or serious brain injury detailed below.

159.     On the drive to the jail from the site of the arrest near Daniel Field, to the jail in South Augusta, Plaintiff began moaning and stating that he needed to go to the hospital, but Defendant Gaiter ignored the obvious sign of a concussion or brain injury for which he should have been monitoring, and continued to the jail.

160.     Upon information and belief, Plaintiff's moaning and saying he needed to go to the hospital, occurred within about five minutes of Gaiter driving Plaintiff away from the scene of the traffic stop.

161.     At one point, about a third or half of the way to the jail Gaiter responded to a request by Jones, Jr. to go the hospital with the response that Jones had rejected such a request at the scene, and therefore it was too late then to go to the hospital.

162.     Upon information and belief, if Defendant Gaiter had taken Plaintiff to the hospital after hearing his moaning and statements requesting medical attention, Plaintiff would likely have arrived at the hospital by about 8:03 pm, about 28 minutes earlier than Plaintiff's 8:31 pm arrival time at the hospital.

163.     When Defendant Gaiter arrived at the jail, he saw that Plaintiff was completely nonresponsive and then finally took him to the hospital.

164.     The 28-40 minute delay in taking Plaintiff to the hospital substantially contributed to Plaintiff's death: but for the delay he would have begun receiving treatment that much sooner, including surgery to relieve the pressure in his brain that caused his death, and upon information and belief, discovery, including medical evidence and a one or more doctors' testimony, will show that it was likely that Plaintiff's life could have been saved if he had been timely taken to the hospital.

165.     The challenged delay in care for Plaintiff proximately caused his pre-death pain, suffering, and injuries, and his death, and the injuries, suffering and damages as more specifically articulated in paragraphs 36-44 and 159-60.

### COUNT 8: Supervisory liability
### against Defendant Sheriff Roundtree

166.     Defendant Sheriff Roundtree is liable under 42 U.S.C. § 1983 for causing the unconstitutional excessive force used on Plaintiff as detailed in Counts 5 and 6 and the damages therefrom.

167.     Defendant Russell stated that his tasing of Plaintiff was justified because that's why tasers were invented, to allow the officer to use them on people so the officer does not have to get physically involved with the suspect to avoid the effort and possibility of injury to the officer however remote or minor and regardless of whether less dangerous measures could have reasonably seized the suspect. .

168.     Upon information and belief, and based on Defendant Russell's several years working at the department and his prior promotion to Investigator, Defendant Russell's

26

statement indicates that the Sheriff's Department had a preexisting policy or custom of authorizing the use of a taser whenever that could prevent officers from having to physically engage, in any degree with a suspect in any circumstance, even when less than lethal force was required.

169.    Defendants Gaiter and Russell were never disciplined for their use of force on Jermaine Jones, where Russell and Gaiter, were placed on administrative leave soon after the incident, and were back on duty less than a week later.

170.    Upon information and belief, Sheriff Roundtree implemented or approved of a policy or custom authorizing officers to tase a fleeing suspect regardless of the risk.

171.    Sheriff Roundtree, upon information and belief, learned from the reports of the incident in an internal investigation, and from the GBI investigation into the death of Plaintiff, that Defendant Russell tased Plaintiff in the back while leaving, without giving a warning, and when there was not a threat to safety from Plaintiff.

172.    Sheriff Roundtree did not discipline Russell because, upon information and belief, Sheriff Roundtree concluded that Defendant Russell was acting in accordance with the pre-existing department policy per se authorizing the use of the taser on fleeing suspects.

173.    Sheriff Roundtree's policy or custom of per se authorizing taser use on fleeing suspects posed an obvious and substantial risk that officers following that policy or custom would use the taser on fleeing suspects in violation of the Fourth Amendment in situations (1) where the person is not suspected of felony or violent crime, (2) the person poses no risk of harm to others, (3) where the taser use would likely result in substantial injury or death due to the person falling while tased and hitting their head on the ground, and (4) even though a warning to the person or a less severe use of force was reasonably available to seize the person, as was the case for all four when Defendant Russell tased Plaintiff.

27

174.    Sheriff Roundtree's policy or custom of per se authorizing taser use on fleeing suspects foreseeably caused Defendant Russell to tase Plaintiff in violation of the Fourth Amendment because Defendant Russell was following that policy or custom.

175.    Sheriff Roundtree did not discipline Defendant Gaiter for his blows to Plaintiff's head, despite Sheriff Roundtree being aware, from the reports of the incident by his own officers in an internal investigation, and from the GBI investigation into the death of Plaintiff, that Defendant Gaiter had struck Plaintiff in the head at least once and up to three times when Plaintiff's head was already pinned on the ground, by the much heavier Gaiter, and quickly by two or three other officers holding Plaintiff down; Plaintiff was at most passively resisting; and Defendant Gaiter knew that Plaintiff did not have a weapon.

176.    Upon information and belief, Sheriff Roundtree's decision to not discipline Defendant Gaiter for his gratuitous blows to Plaintiff's head, reflected a pre-existing custom, implemented or approved by Sheriff Roundtree, authorizing the punitive use of gratuitous force on persons who try to flee from them.

177.    A custom authorizing the punitive use of gratuitous force on persons who tried to flee the police is facially unconstitutional and Defendant Roundtree must have known that the custom would obviously result in his officers violating the Fourth Amendment rights of those who try to flee from the police.

178.    Defendant Gaiter followed this custom and likely would not have struck Plaintiff in the head if he thought it would lead to disciplinary action.

### COUNT 9: State law claim for assault or battery against Defendants Leslie Gaiter and Richard Russell

179.    Defendant Gaiter is liable under state law for his assault, and alternatively for battery, on Plaintiff on October 11, 2021.

180.    When Defendant Gaiter tackled Plaintiff, upon information and belief, he intentionally and maliciously slammed Plaintiff's head into the ground, and he then

struck Plaintiff's head with his hand three or more times in a closed fist or using the heel of his hand.

181.     Defendant Gaiter had no legitimate authority or reason to slam or hit Plaintiff's head because Plaintiff was unarmed, and he was pinned with his stomach to the ground by three or four larger officers, and was not actively resisting.

182.     Defendant Gaiter's assault of Plaintiff shows Gaiter's actual malice by intentionally targeting Plaintiff's head to injure him and punish him for attempting to leave the traffic stop.

183.     Defendant Russell tased Plaintiff even though he lacked lawful authority to use such extreme force when Plaintiff was not a threat to anyone, not suspected of any serious or violent crime, and when Defendant Russell reasonably had time to warn Plaintiff before tasing him.

184.     Defendants Gaiter and Russell each acted out of actual malice towards Plaintiff: they were upset that he tried to flee.

185.     Defendant Gaiter and Russell's assault on Plaintiff proximately caused Jermaine Jones, Jr.'s pre-death injuries, and pain and suffering, and his death, and the injuries, suffering and damages as more specifically articulated in paragraphs 36-44 and 159-60.

### COUNT 10: State law claim for denial of medical care
### against Defendants Russell and Gaiter

186.     Defendants Richard Russell and Leslie Gaiter are liable for negligence under state law in failing to timely take Plaintiff to the hospital after he was beaten on October 11, 2021, and was the highly likely victim of a concussion and serious brain injury.

187.     Defendants Russell and Gaiter each knew and must have known that because of the extreme force used on Plaintiff's head from the tackle and the blows to the head,

all while his head on the pavement, that Plaintiff had a substantial risk of a serious concussion or brain injury.

188.  Defendant Russell failed to immediately instruct that Plaintiff should be taken to the hospital and then instructed Defendant Gaiter to take Plaintiff to the jail instead of the hospital, which caused an approximately 40-minute delay in Plaintiff getting to the hospital.

189.  Defendant Gaiter, on his way with Plaintiff to jail, heard him moaning and groaning and saying he needed to go to the hospital, but Gaiter disregarded these obvious signs that Plaintiff had a concussion or other serious brain injury, and continued to the jail.

190.  Defendants Richard Russell and Leslie Gaiter each harbored and acted out of actual malice towards Plaintiff: they were upset that he had tried to run from them and punished him for it by denying him potentially life-saving medical care.

191.  Defendants Richard Russell and Leslie Gaiter each violated their ministerial duty to provide medical care known to be necessary to an arrestee or pretrial detainee.

192.  The denial of timely emergency medical care for Plaintiff proximately caused Jermaine Jones, Jr.'s pre-death injuries, and pain and suffering, and his death, and the injuries, suffering and damages as more specifically articulated in paragraphs 36-44 and 159-60.

WHEREFORE, Plaintiffs pray judgment against one or more Defendants, individually or jointly for the following:

  a.  Compensatory damages for pre-death pain, suffering, and injuries, as allowed by law, and for the wrongful death of Jermaine Jones Jr., i.e. the value of his life as to be shown at trial;

  b.  Special damages, as more particularly shown at trial, including Plaintiff's medical expenses,

c.      Damages for injuries caused by deprivation of Constitutional rights under the United States Constitution;

d.      Punitive damages against each individual Defendant in their individual capacity;

e.      Reasonable attorney fees, costs and expenses of litigation under 42 U.S.C. § 1988 or under Georgia law for bad faith litigation.

f.      Any other and further relief so ordered.

A JURY TRIAL IS HEREBY REQUESTED.

This 11th day of October, 2023.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
1104 Milledge Road
Augusta, GA 30904
706-737-4040
jpbatson@aol.com
Attorney for Letayia Anderson, natural mother
and guardian ad litem for A.K. J., minor,
and sole surviving next of kin of Jermaine Jones, Jr., father
if of A.K.J. and Plaintiff's Decedent
Lead Counsel for Plaintiffs


Hunter A. Gregg, Esq.
Georgia Bar No. 574704
The Roth Firm LLC
1600 Parkwood Circle SE, Suite 600
Atlanta, GA 30339
Phone: (404) 250-3236 Ext:
Fax: (404) 393-9770
Attorneys for Keyana Gaines, Administratrix for the
Estate of Jermaine Jones, Jr., Plaintiffs' Decedent

Prospective Pro Hac Vice attorneys for Estate
Administratrix Keyana Gaines

Prepared by:

John P. Batson

Ga. Bar No. 042150

1104 Milledge Road

Augusta, GA 30904

706-737-4040

jpbatson@aol.com